Good morning, Your Honors. My name is Nancy Henschkleff, and I'm a lawyer from Phoenix, Arizona, and I am counsel for Appellant Jagdish Singh. As the Court's aware, three issues were briefed by the appellant in this case, and I'd like to address some points, additional points and emphasize certain points as to Argument 1, which is the argument that the 84-month sentence that was imposed upon my client was unreasonable, and that the Court clearly erred in some of the factual findings that it made. The opening brief itself cites three cases, the Woods case, the Morris-Bolina case, and the, I'm going to pronounce it, a preponderance of the evidence, that the defendants in those cases were, in fact, managers, supervisors, leaders, or organizers. And in all of these three cases that we cite, we have a situation where the sentencing judge erred in making the finding that it did and determining that the person was, in fact, a leader, organizer, or a supervisor, manager. And that's basically what I'm asking the Court to do in this case. Counsel, what do we do with the fact that Singh explained to Chima and Paul how the counterfeit cards work? He transported the group. He handed out the counterfeit cards. He selected the ATMs to target and conferred with his brothers when the police almost caught them in Tucson. What do we do with all of that? That seems to point the other direction, does it not? Well, obviously, there's a good argument that that is so. But what I'm asking the Court to do is consider the case law that says that due process requires, and before a judge makes factual findings, he has to make sure that the evidence that he is relying upon, and in this case, the evidence of the kinds of facts that you just stated to me, that that evidence is, in fact, reliable. And if it's not reliable, it would be a violation of due process to allow that evidence to support an enhancement of sentence, be it for manager, supervisor, or any other type of upward adjustment. And the argument that I'm making in this case is that this Court, even though you obviously give great deference to what the trial court has done in a case such as this, we all know that this is true, and we also know that he had to have clearly erred. I'm asking you to find that in this case for the reason that the evidence that he is citing, and as you state, this very specific ruling that he has made as to what his thinking is and why he is doing what he is doing, that that particular information is unreliable. Now, I realize... What is the showing that you can make about its unreliability? Well, first of all, if you read his statement, he tells us that he is basing his factual findings on the testimony of two cooperating witnesses, Mr. Chima and Mr. Paul. He basically seems to rely more on the testimony of Mr. Chima than Mr. Paul. And the things I think that the Court should consider in considering the reliability of Mr. Chima is the evidence that shows, number one, the sayings, Jagdish and his brothers were from India and they spoke Punjabi. And we know from the record in this case that Mr. Chima, in fact, did not speak Punjabi or understand it very well. Mr. Paul, on the other hand, who was the other cooperating witness who was there every time that Mr. Chima was there hearing these things go on, he was an individual who, in fact, was familiar with Punjabi. And now, are you going to base your decision just on that fact? No. But there are other facts that I think in the record that support the notion that the evidence that the judge relied upon was unreliable. There's the language I just mentioned. Also, if you look at the record and see what Mr. Chima actually said, several of the things he's talking about are discussions that these individuals had. And these discussions that were had, again, were had in Punjabi. He was never able to quote anything that my client said. He would just say, oh, well, they discussed this. They discussed how we should proceed with the cards and go about with this scam. When he was asked, well, what did Jagdish Singh say, he was unable to quote what Jagdish said during the discussion. He was unable to even paraphrase what Jagdish said during any of these discussions. And, again, he admits that these conversations were, for the most part, in Punjabi, maybe sometimes a very little English, and he really didn't understand that language very well. In addition. The most involved was the one with the fourth claim for relief, the fourth claim. Jagdish was most involved with that fourth count, was not? He was really directing Chima and Paul with regard to that, specifically. Judge, I think I understand your question. And I think basically the theory upon which he was convicted was that he was a co-conspirator and responsible for these things across the board. Now, the fourth count was, in fact, a bank fraud count, but he was not. My client never was the driver and never left the car and never went up to any of these machines and never actually personally was involved in any of that activity. So he was I don't believe actually, sir, that he was actually accused of being more involved in the fourth count than any of the others, unless I'm missing your point. I think it's important to consider the testimony of Mr. Paul, because Mr. Paul was a person from India who did speak Punjabi and who also spoke to these same discussions that were supposedly made in front of Mr. Chima as well. And as is pointed out in the brief, Mr. Chima's version, excuse me, Mr. Paul's version was that while, for example, they were discussing what to do, Mr. Paul indicated that my client just sat in the back and listened, and that when he was asked, well, was he asked any questions? Did he say anything? The answer was no. And, in fact, in the other instances where the judge concluded that my client engaged in these discussions, if you look at the evidence as to what was actually said on those occasions, you will find that although Mr. Chima did say, in fact, he participated in the discussions, again, never could say what he said, never could quote him, never could paraphrase him, never could in any way indicate, well, how was he participating in these discussions. And I submit that just saying that somebody participates in a discussion doesn't make them a supervisor or a manager. And, of course, we're not considering whether he's a leader or an organizer in this case, because, of course, the judge found he wasn't a leader or organizer but instead said that he was a manager or supervisor. Again, one of the things that the judge cites is the driving of the vehicle. And I submit to you that although maybe in some circumstances driving the vehicle could be an indication of supervisorship, in this case it was not. The testimony from Suquinder Paul, who spoke their language, says that it was his brothers who said that he was going to be the driver. My client was the only person in Arizona who lived in Arizona. The rest of these people were from out of town. He was the only one that had an Arizona driver's license. So naturally, he was the natural one to be the driver, and that was his role, and the offense was to be the driver. One of the factors that I'd like to mention is the fact that he was also the younger brother. And the tenor of the evidence in the case is that here is somebody who's the younger brother who's being directed by his older brother, and that is basically the testimony that was provided by Suquinder Paul. I note that my time is going away, and so I'm going to reserve. Would you like to reserve? If I could. You may do so, counsel. Thank you. We will hear from the government. May it please the Court. My name is Daniel Drake. I'm with the U.S. Attorney's Office in Phoenix, Arizona. The defense at trial in this case was not that the events happened on some other date or that they didn't happen at all. The defense here was that Jagdish Singh simply was not involved. That changes in some extent the tenor or the manner in which this Court should consider the evidence and consider the allegations of error. With respect to the sentencing issue, let me address that first. Jagdish Singh's testimony was a distinct contrast, a diametrical opposite to what the cooperating witnesses, Chima and Paul, said. The jury considered all three witnesses' testimony and ruled in favor of the government. In other words, they disregarded the testimony of Jagdish Singh, and they found reliable and found probative beyond a reasonable doubt the evidence that came from the mouths of Rajpal Chima and Suquinder Paul. Those witnesses described, dealing with their argument regarding the sentencing, as outlined in the Court's finding, which I've referenced in my brief at page 45 and 46, that Jagdish Singh did a number of things. If you will, the three of you are going to decide this case. The three of you will confer as to what is to happen, and Ms. Hinchcliffe and I will. Well, Chima and Paul weren't involved in all of the counts, were they? No, they were not, Your Honor. Your Honor, the first count was a conspiracy count, and that alleged events that ran from April of 2001 through May of 2003. Count two was... Where Chima and Paul... Chima and Paul were implicated in that, and a number of the overt acts that were referred to there involved them. Count two is a sort of separate event in the sense that it involved a transaction in September of 2001 involving Gurdev Singh making a withdrawal from the account of Alexis Kincaid. Before Chima and Paul, right? That was before Chima and Paul. Okay. But they arrived in May or April 30, 2003, and were here throughout. And what their testimony described was an operation that ran, quite frankly, much like that in May of 2002 and September of 2001. Well, the only thing he really could have been an organizer of individually other than as a comparator was when Chima and Paul were involved, isn't it? Yes, because at that point you had five now. And in addition, there is a distinction or a break between the brothers, that is to say, the level at which they were operating and planning this thing and those who were below them. And with respect to that, I would point to two different things. First, on one occasion, as they were going around and picking out things, Chima appeared nervous, and in response to that, Jagdish Singh cautioned him to stay calm. Nothing's going to happen. Just act like it's a normal transaction, in essence, telling him how he should conduct himself at the ATM. Well, the other two brothers weren't there, though. There was no explanation on the record at that point of who was or who was not present other than Jagdish. All right? The other thing that Jagdish tended to do was to give out cards, that is to say, when they would come back to the vehicle with the used cards and the money and the receipts, they'd put that in the material, and Jagdish would give them a bundle of cards, according to one of the witnesses. And so he participated in doing that. I guess there's really a number of other things that we could talk about on that in the sense that the testimony was that Jagdish would drive around and pick them up, and when they were dropping them off, he would look for machines at other places. And that's referenced in the testimony of Supwinder Paul and also in Rajpal Chima. There are some other factors that were not specifically outlined in the court's ruling, and that had to do with the issue of what Jagdish was able to do, Jagdish Singh, on his own in the absence of others. It's clear that neither of the brothers, Latvir Singh nor Gurdev Singh, worked at the 7-Elevens or the Chevron store where these numbers were compromised. And while it's not quite clear in the record how it was done, there was adequate information in the record to show that it was easily possible, that people could look over somebody's shoulder, look at the number and get the pin number, that there was cabling that connected these things together, and it's computer cabling, and it's easy to plug something in the middle of it and have it go straight through. Who would you classify as being the organizers of this whole scheme? The ones who seemed to do the most talking and have the clearest vision on this thing to some extent were Latvir Singh and Gurdev Singh, at least according to Cheema and Paul. So they were the organizers, Cheema and Paul? I think that the evidence would show that they had a more active role than what went on, than what Jagdish did. Now, he still qualifies as a manager or supervisor because he did that with respect to the two brothers. But let me stop for a second and explain, if I can, that particular aspect. Jagdish Singh worked at these stores, and he was the only one, the evidence demonstrates, who could have accomplished the compromises. And the theory is the compromises occurred prior to the time that everybody showed up in the country to make the actual withdrawals. And as you follow it through, Jagdish worked at each of the five stores where this happened. He admitted that, and when he moved from 5050 West McDowell to 1405 North Scottsdale Road, there were no more compromises at 5050 West McDowell. And when he left 1405 North Scottsdale Road, there were no more compromises there. Which count is that involved in? Which count? Well, the counts two through the end were counts that all occurred in the May 2003 time frame or that ran into that period of time. Counsel, we're only talking about manager-supervisor, which is a three-level increase. Organizer or leader would be four levels. But do we have to look at whether or not somebody else was regarded as the organizer, or could we just look in terms of the sentencing of this individual as to whether that individual meets the supervisor-manager category? I believe you only have to look at this particular individual. That's all that's before you at this point. And if there is adequate evidence in the record to support the district court's findings. What's your response to Ms. Hinchcliffe's argument that we should take some of this testimony that the trial judge relied on with a grain of salt, this problem of the Punjabi language and that sort of thing? I don't think you responded to that. Okay. The trial judge had to go through all those aspects, just as the jury had to, and make its own determination of what was proved and what was not. And with respect to the issue of the Punjabi language, the way Chima described the conversations were that most of them were a mix of Punjabi and English, that there was a little bit of give and take on these things. You may recall during the testimony of Jagdish Singh, on occasion he would bypass the interpreter and give things in English, and on occasion for part of his testimony he actually testified in English. So there is a bit of back and forth on this issue, and I think that it's the district court's determination as to the reliability. So those, I think, have I answered your questions? Thank you. All right. I'm about out of time here, so there are a couple of other things I want to say with respect to the other charge in the indictment, or the other allegations, rather, and that is that the indictment should have been read, should have been given to the jury, or that the jury instructions in some fashion misled the jury. First, there was no objection on those issues, and while the normal standard of a review is abuse of discretion, the formulation of the instructions, or whether the court should have given the jury the indictment, the plain error standard would apply here, and I suggest because of the defense there was no error or prejudicial error. Did both counsels stipulate? I wasn't quite clear about that. It did not be read? Yes. It ended up that way, I think. It was by agreement. In other words, defense counsel expressed reluctance. I pointed out that there might be certain confusing issues that came from that, and defense counsel said, well, I'll take that as an invitation, and I would agree that it not be read. Well, at least there was no objection. There was no objection. Okay. And I think you'll find from the jury instructions, which go through and describe by, not necessarily by date, by detail, the place and time. I'm sorry, not the place and time, but the place and the person. For example, it said that Alexis Kincaid, he had a Bank of America ATM in Tucson, Arizona on North Stone, and the evidence supported that. I see I'm out of my time. Thank you, counsel. Thank you. Thank you, counsel. Your time has expired. Ms. Hinchcliffe, you have some reserve time? I think it's about a minute and a half. 120. Okay. And obviously I've got to be brief. I would just say the testimony about my client telling him to be calm, I believe, came about at a time when they thought that some security officers had caught on to them down in Tucson, Arizona. And they were all, according to both of these cooperating witnesses, very nervous and very excited. And it was during that time frame that my client spoke out and said, stay calm. I don't think that's an indicia of being a manager or supervisor of a group. I think it's just a comment. It should not have been considered as such by the Court. There was some indication that he raised that my client may have been involved in other activity, and he said the theory was that my client had helped assist in retrieving the card information, the stolen card information, while working at these convenience stores. It was a theory. We don't know whether the jury decided to convict my client based on his participation in that, to that extent, or as the driver of the vehicle. But so there is no specific finding by that jury that, in fact, he was involved in the acquisition of the stolen information. And I think even more important than that, there was no finding by the trial judge in this case that that information should be relied upon to make him a supervisor or a manager, and I'd ask the Court to consider that. So in closing, you mentioned that there are two other arguments that have been made, and I just want to state this. I think the government was very accurate in its rendition of the facts as to what the defense position was at trial regarding the instructions. And, in fact, although initially the defense attorney was ambivalent about whether or not the indictment should be read to the grand jurors, at one point he did, in fact, say that he joined in the giving of that. And the words used in the record is joined, and that is correct. And I think that information is being portrayed accurately. Thank you, counsel. Your time has expired. I do have one clarifying matter. Chuma and Paul weren't there during all of the episodes at the ATM, were they? No. And I'm sorry. So what we're talking about is after Chuma and Paul came and became involved, was Fegish, in fact, involved as a supervisor of them? Yes. Okay. And that's based on the case rule, and that's what it is. Thank you, counsel. The case just argued will be submitted for decision.
judges: Hug, O'scannlain, Benitez